USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 9/28/2015

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WAYNE HUNTER,

                    Plaintiff,

        v.

CITY OF NEW YORK, CITY OF NEW
YORK DEPARTMENT OF CORRECTION,
JAMES BOWDEN, ALICE CONCEPCION,
DANIEL O'CONNELL, and PATRICK
WALSH,

                    Defendants.

No. 10-CV-3532 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

While Plaintiff Wayne Hunter was a pretrial detainee charged with crimes including rape and sexual assault, he repeatedly contacted his former girlfriend—the victim of his alleged crimes (the "victim")—by sending her letters, calling her on the telephone, and directing his brother (who was not incarcerated) to call her. During this time, Plaintiff also wrote letters to and called the assistant district attorney and New York State court judge handling his case. As a result, the judge entered an order directing the City of New York Department of Correction ("DOC") to prevent Plaintiff from sending mail to the victim, from calling anyone except his attorney, and from enlisting anyone to make a call on his behalf. The order authorized DOC to "move [Plaintiff] to a different facility, if necessary" to ensure compliance.

The same day the state court judge issued the order, Plaintiff was transferred from the general population at Manhattan Detention Center ("MDC") to the 9 North Unit ("9 North"), a segregated housing unit designated to house inmates under "court ordered lockdown." In 9 North, inmates are kept in their cells for 23 hours per day, strip searched daily, placed in enhanced security

restraints while being transferred from their housing areas, and prevented from attending religious services. The state court order remained in effect for 350 days, and Plaintiff was housed in 9 North for 353 days.

Plaintiff contends that the conditions of his housing assignment exceeded the specific restrictions articulated in the state court order, and he brought this action pursuant to 42 U.S.C. § 1983 alleging that those conditions violated his rights under the Fourteenth and Eighth Amendments to the Constitution. Hunter also contends that, in violation of his rights under the Fourteenth Amendment, his assignment to 9 North was not reviewed as required by DOC policies. Defendants the City of New York and DOC employees James Bowden, Alice Concepcion, Daniel O'Connell, and Patrick Walsh maintain the conditions in 9 North were necessary to comply with the terms of the state court order and that they followed the procedures in question.[1]

The parties cross-moved for summary judgment. Although the conditions of Plaintiff's confinement were undoubtedly restrictive, the Court must defer to prison officials to adopt policies and make discretionary decisions that permit them to operate their penal institutions effectively. That discretion, however, is not without limits; the Court need not defer to prison officials when they fail to comply with mandatory terms in their own policies, as Plaintiff alleges the individual Defendants did here with regard to the procedural safeguards to which Plaintiff was entitled. Accordingly, and for the reasons stated below, Plaintiff's motion is denied and Defendants' motion is granted in part and denied in part.

---

[1] Although Plaintiff separately names DOC as a Defendant, all claims against it must be dismissed. "New York City departments, as distinct from the City itself, lack the capacity to be sued." *Ximines v. George Wingate High Sch.*, 516 F.3d 156, 160 (2d Cir. 2008); *see Woodward v. Morgenthau*, 740 F. Supp. 2d 433, 440 (S.D.N.Y. 2010) (dismissing claim against DOC).

2

## BACKGROUND[2]

### I.     Relevant Facts

#### A.     The Parties

At all times relevant to this action, Plaintiff was a pretrial detainee at MDC. Pl.'s 56.1 ¶ 1. Defendant Bowden was employed as a Security Captain in DOC's Operations Security and Intelligence Unit ("OSIU"), Defendant Concepcion was employed as a Captain in OSIU, Defendant O'Connell was employed as a Deputy Warden of Security at MDC, and Defendant Walsh was employed as the Chief of Special Operations in OSIU. *Id.* ¶¶ 11–14.

#### B.     Plaintiff's Telephone and Mail Use Restrictions

In October 2007, Plaintiff was arrested after a physical altercation with the victim, his former girlfriend, and charged in New York State court with crimes including rape and sexual assault. Pl.'s 56.1 ¶ 35; Defs.' 56.1 ¶¶ 12–14; Stephens Decl. in Opp. Ex. 24. Plaintiff was warned not to have any contact with the victim while his trial was pending. Defs.' 56.1 ¶ 15. Plaintiff nonetheless sent her fourteen letters and called her multiple times, including to tell her to expect more letters from him. *Id.* ¶¶ 16, 18; Pl.'s 56.1 ¶ 37. Plaintiff's brother also communicated with the victim by telephone. Toews Decl. Ex. C at 4–5. During this time, Plaintiff also wrote letters to and called the assistant district attorney and state court judge handling his criminal case. Defs.' 56.1 ¶ 19.

In response, the District Attorney's Office sought a court order to restrict Plaintiff's telephone and mail privileges and prevent Plaintiff from contacting the victim, either directly or

---

[2] Unless otherwise noted, the following facts are undisputed and derive from the following: the Statement of Undisputed Material Facts in Support of Plaintiff's Motion for Summary Judgment Pursuant to Local Civil Rule 56.1 ("Pl.'s 56.1"), Defendants' Response to Plaintiff's Local Rule 56.1 Statement ("Defs.' Resp. 56.1"), Defendants' Local Civil Rule 56.1 Statement of Undisputed Facts ("Defs.' 56.1"), Plaintiff's Response to Defendants' Local Civil Rule 56.1 Statement of Undisputed Facts ("Pl.'s Resp. 56.1"), and the evidence submitted by the parties in connection with their motions.

through someone else. *Id.* ¶ 20. On December 21, 2007, the Honorable Bonnie Wittner, Justice of the Supreme Court of New York, granted such an order (the "December 21, 2007 Order"), directing that DOC:

> (i) shall bar and otherwise prevent [Plaintiff] or any other inmate on behalf of [Plaintiff] from making telephone calls except to [Plaintiff's] attorney . . . while in the custody of [DOC]; and (i[i]) shall bar and otherwise prevent [Plaintiff] or any other inmate on behalf of [Plaintiff] from writing letters or any other type of mail to [the victim]; and (iii) move [Plaintiff] to a different facility, if necessary, in order to comply with this Order.

Stephens Decl. Ex. 2. Justice Wittner modified the restrictions imposed on Plaintiff on February 15, 2008 (the "February 15, 2008 Order") and August 18, 2008 (the "August 18, 2008 Order") to expand the number of individuals Plaintiff was permitted to contact by telephone. Stephens Decl. Exs. 14, 15. Plaintiff complained about the conditions of his confinement—which he claims amounted to solitary confinement—to Justice Wittner at every court appearance during his criminal prosecution. Defs.' 56.1 ¶ 32; Hunter Tr. 85.

On December 5, 2008, Justice Wittner issued an order lifting Plaintiff's telephone and mail restrictions entirely (the "December 5, 2008 Order"). Stephens Decl. Ex. 23. Altogether, the restrictions imposed on Plaintiff's telephone and mail use were in place for 350 days, from December 21, 2007 through December 5, 2008.

## C.    Centrally Monitored Case Status

After receiving the December 21, 2007 Order, DOC classified Plaintiff as a "centrally monitored case" ("CMC"), which allows it to track "selected inmates so that [DOC] is continually aware of the housing, transport and case status of such inmates." Defs.' 56.1 ¶ 34; Stephens Decl. Ex. 17 ("Directive 4505R") § II(A).

DOC's Directive 4505R, the current version of which has been effective since February 10, 1992, governs the procedures relating to CMC status. Directive 4505R gives OSIU the

4

authority to assign inmates CMC status "based upon documented facts developed from a review of records and information including . . . [c]ourt documents." Directive 4505R § IV(A)(2)(f).  To assign an inmate CMC status, OSIU must determine that the inmate meets one of ten criteria, two of which are "[i]nordinate interest in the inmate on the part of other law enforcement agencies (courts, district attorneys, police, etc.)" and "any other identified factors or circumstances which would tend to indicate a requirement for central monitoring." *Id.* §§ IV(A)(3)(i)–(j).

Directive 4505R also mandates that prison officials follow certain processes when an inmate is designated CMC.  Once an inmate is assigned CMC status, OSIU must (1) "issue a Department-wide Teletype Order designating that inmate as a C.M.C."; (2) prepare a "C.M.C. Information Record documenting the facts and circumstances surrounding the inmate's designation"; and (3) forward the Information Record to the Security Deputy Warden of the inmate's facility.  *Id.* §§ IV(B)(1)–(2).  The Security Deputy Warden must then "ensure that the newly designated C.M.C. inmate's Accompanying Card . . . is clearly and legibly stamped 'C.M.C.'"  *Id.* § IV(B)(3).  Directive 4505R further provides that CMC "designation shall not, by itself, cause an inmate to be housed in a special housing unit or area, or to be deprived of any institutional program opportunities, or be subjected to any restrictions of movement within a facility, or to be subjected to any enhanced security measures (such as waist chains and/or leg irons) when transported outside the confines of a secure facility."  *Id.* § II(A).  DOC may subject CMC inmates to enhanced security measures, but only "as a separate decision."  *Id.* § II(B).

Inmates assigned CMC status do not receive due process hearings.  *Id.*  Inmates must, however, receive a "Notice of C.M.C. Designation" within 72 hours of receiving CMC status, and they have a right to appeal their status "at any time."  *Id.* §§ IV(D)–(E).  When an inmates appeals, "the Deputy Chief of Security Operations or Chief of Department shall respond" within 15 days.

*Id.* § IV(E). In addition, regardless of any appeal, the "Deputy Chief of Security Operations [is] responsible for a twenty-eight (28) day review of all C.M.C. status designation for all C.M.C.'s" (the "28-Day Review"), and each 28-Day Review must be recorded on a form, delivered to the inmate, and maintained in a central file. *Id.* § IV(F). If, as a separate decision, an inmate is placed in involuntary housing or receives non-routine security restraints during transportation, Directive 4505R provides that a due process hearing should occur as "required" by another DOC directive. *Id.* § II(B).

Plaintiff was assigned CMC status on December 21, 2007, the same day Justice Wittner issued the December 21, 2007 Order. Defs.' 56.1 ¶ 34. The CMC Information Sheet regarding Plaintiff's change in status states that Plaintiff was designated as CMC pursuant to a "court ordered lockdown." Defs.' 56.1 ¶ 40; Bowden Decl. Ex. B; Stephens Decl. Ex. 9. Captain Concepcion, who was responsible for designating and reviewing the status of CMC inmates at MDC during the relevant time period, authorized Plaintiff's CMC classification on this basis. Pl.'s 56.1 ¶¶ 16–17, 59; Defs.' 56.1 ¶¶ 41.

Later that same day, Captain Concepcion and Chief Walsh reviewed Plaintiff's CMC designation and completed a "Review of CMC Designation Form." Pl.'s 56.1 ¶ 18; Bowden Decl. Ex. C; Stephens Decl. Ex. 10. Both Captain Concepcion and Chief Walsh recommended that, because of the "court ordered lockdown," Plaintiff receive "lock-down" housing. Pl.'s 56.1 ¶¶ 20–21; Bowden Decl. Ex. C; Stephens Decl. Ex. 10. Defendants assert that when an inmate is assigned CMC status because his "contact with others must be restricted in order to prevent the inmate from threatening or harassing a witness," that inmate is automatically assigned to a segregated housing unit. Bowden Decl. ¶ 17.

6

Also on December 21, 2007, a corrections officer working for Deputy Warden O'Connell prepared a document entitled "Court Ordered Lock Down Restrictions," pursuant to which Plaintiff was required to wear "waist chains and leg irons" when "outside the facility." Pl.'s 56.1 ¶ 23, 25; Bowden Decl. Ex. D; Stephens Decl. Ex. 11.  According to Defendants, this document "indicate[s] the restrictions to which Plaintiff was subject in connection with each court order that restricted Plaintiff's telephone and mail privileges."  Bowden Decl. ¶ 36.  Deputy Warden O'Connell reviewed the December 21, 2007 Order in connection with his supervision over the creation of the "Court Ordered Lock Down Restrictions" document. Pl.'s 56.1 ¶ 24.

On December 27, 2007, a near-identical second CMC Information Sheet was prepared for and authorized by Captain Bowden, who was also responsible for designating and reviewing the status of CMC inmates at MDC during the relevant time period. Pl.'s 56.1 ¶ 27; Defs.' Resp. 56.1 ¶ 59; Stephens Decl. Ex. 13.

On February 19, 2008, in response to the February 15, 2008 Order that expanded the number of individuals Plaintiff could contact by telephone, a corrections officer working for Deputy Warden O'Connell prepared a revised "Court Ordered Lock Down Restrictions" document, which Deputy Warden O'Connell reviewed and annotated.  Pl.'s 56.1 ¶ 31; Stephens Decl. Ex. 12.

The parties dispute whether Plaintiff's CMC status was reviewed in accordance with the procedures outlined in Directive 4505R.  Although Plaintiff contends that he appealed his CMC designation, Pl.'s 56.1 ¶ 67; Hunter Tr. 41–42, Defendants assert that "there is no evidence" that he appealed, Defs.' Resp. 56.1 ¶ 67.  The parties also dispute whether Plaintiff received a due process hearing as a result of being subjected to enhanced security restraints and whether Plaintiff received regular 28-Day Reviews of his CMC status.  Plaintiff contends that he received neither,

Pl.'s 56.1 ¶¶ 55, 58; Hunter Tr. 41–42, while Defendants contend that Plaintiff received both because DOC's practice is to conduct those hearings and reviews in every case, Bowden Tr. 105–06; Bowden Decl. ¶ 35. There is no documentary evidence in the record indicating that Plaintiff received a due process hearing. The only documentary evidence in the record indicating that Plaintiff received any 28-Day Reviews is the "Review of CMC Designation Form" that Captain Concepcion and Chief Walsh completed on December 21, 2007. Bowden Decl. Ex. C; Stephens Decl. Ex. 10. Defendants concede "that some records of the [28-Day Reviews] could not be located." Defs.' Resp. 56.1 ¶ 58.

### D.  Conditions in 9 North

As a result of being assigned CMC status and designated for "court ordered lockdown," Plaintiff was housed in 9 North, which is separate from MDC's general population. Defs.' 56.1 ¶ 45; Bowden Decl. ¶ 16. 9 North was designed to house "court ordered lockdown" inmates under the conditions described in a DOC Command Level Order dated January 8, 2001. Pl.'s 56.1 ¶ 15; Bowden Tr. 21.; O'Connell Tr. 44; Stephens Decl. Ex. 3 (the "Command Level Order").

The conditions in 9 North differ starkly from those in the general population; inmates in 9 North are directed to be kept "on twenty-four (24) hour lock-in, feed-in status," and they may not communicate with other inmates. Command Level Order §§ IV(1)(B)–(C). 9 North inmates "are confined on the unit for 23 hours per day," Bowden Decl. ¶ 20, and able to exercise only during the remaining hour, Pl.'s 56.1 ¶ 7. Whenever inmates in 9 North are removed from their housing areas, they must be strip searched "and then restrained in leg irons, waist chain, handcuffs and mitts," and upon return to their housing areas, are strip searched again. Command Level Order § IV(4)(A)(b). Even on days when they are not removed from their housing areas, 9 North inmates

must be strip searched daily. *Id.* § IV(4)(B)(a). They may not leave their cells for religious services. *Id.* § IV(4)(J)(d).

DOC monitors the telephone calls made by and all mail sent by inmates housed in 9 North. Bowden Decl. ¶ 18. By contrast, DOC does not generally restrict the mail of MDC general population inmates, Concepcion Tr. 26; Hunter Tr. 47–48, although there is "a policy in place where the warden of the facility can request that mail is monitored," O'Connell Tr. 23–24.[3]

In addition, inmates housed in 9 North are provided with access to telephones only upon request. Perell Decl. ¶ 18–19. When an inmate makes such a request, a correction officer "confirms the particulars of any applicable telephone restrictions respecting the inmate in question, provides the inmate with a telephone, then dials the number for the inmate, provided the call is not prohibited by Court-Order [*sic*] or other restriction." *Id.* ¶ 19. Inmates in MDC's general population, meanwhile, have "unrestricted access to telephones, which are located on the floor of every general population housing area." *Id.* ¶ 5. To make a call, an inmate must enter his or her unique "book and case" number and a six-digit PIN number. *Id.* ¶ 9; Pl.'s 56.1 ¶ 40. The inmate may then place a call "to any location within the continental United States, Puerto Rico or the US Virgin Islands, provided the inmate has sufficient funds in his account, and the dialed number has not been blocked for any reason, for a maximum of fifteen (15) minutes per call." Perell Decl. ¶ 10.

DOC has the ability both to block a general population inmate's telephone access completely and to block a telephone number from being called by all general population inmates. Pl.'s 56.1 ¶¶ 44–45. Indeed, DOC has blocked telephone numbers from being called by all general

---

[3] A warden might request an inmate's mail be monitored, for example, if he has "intelligence that perhaps somebody is . . . attempting to escape or comment [*sic*] an act of violence." O'Connell Tr. 23. The record does not include any additional details of this DOC policy.

population inmates "many times," including in some circumstances in response to court orders. Perell Tr. 21–23. DOC's telephone system, however, "prevent[s] DOC from allowing an inmate to place calls to a finite number of individuals only." Perell Decl. ¶ 11. It is thus undisputed that although DOC can and does block individual numbers from being called by general population inmates, it cannot configure a general population inmate's phone access so that the inmate may call *only* certain numbers. As a practical matter, moreover, even if DOC could allow an inmate to call only certain numbers, given "the physical configuration of the telephone system, coupled with its technological capabilities," it would prove difficult for DOC "to preclude one inmate from placing a call on behalf of a fellow inmate." *Id.* ¶ 12.

## E.   Plaintiff's Experience in 9 North

Plaintiff was housed in 9 North as a pretrial detainee for 353 consecutive days—from December 21, 2007 through December 8, 2008. Pl.'s 56.1 ¶ 4. During this time, Plaintiff was subjected to the restrictions in the Command Level Order and his telephone and mail access were restricted to comply with Justice Wittner's orders. Defs.' Resp. 56.1 ¶ 6.

Plaintiff contends that as a result of the leg irons, waist chains, handcuffs, and mitts that were applied whenever he left his 9 North housing area, he declined to continue receiving medical treatment on a wrist injury sustained before he was assigned CMC status. Pl.'s 56.1 ¶ 8–10. According to Plaintiff's medical records, Plaintiff was treated for "right wrist . . . pain" on November 28, 2007, and for "R wrist chronic deQuervain's tenosynovitis" on December 12, 2007, before he was housed in 9 North. Stephens Decl. Ex. 7. There is no medical evidence that Plaintiff received treatment for his wrist while he was housed in 9 North. Plaintiff asserts that he refused

10

further treatment "because [the] shackles are so tight" when he was transported from 9 North to the treatment facility on Rikers Island.  Hunter Tr. 57.[4]

Following Justice Wittner's December 5, 2008 Order lifting all mail and telephone restrictions against him, Plaintiff was removed from 9 North and returned to MDC's general population on December 8, 2008.  Defs.' Resp. 56.1 ¶ 70; Bowden Decl. ¶¶ 40–41.  Defendants do not indicate why it took three days to return Plaintiff to general population, except that Plaintiff was transferred "[a]fter [DOC] receiv[ed] the Order."  Bowden Decl. ¶ 41.

## II.    Procedural History

Plaintiff initiated this action *pro se* on April 22, 2010.  *See* ECF No. 2.  He filed an Amended Complaint on September 28, 2010, and a Second Amended Complaint on July 2, 2013, both *pro se*, as well as a Third Amended Complaint ("TAC") on November 25, 2014, this time with the assistance of counsel.  ECF Nos. 9, 84 & 119.  The TAC alleges that the conditions of Plaintiff's confinement in 9 North violated his rights as a pretrial detainee under the Fourteenth and Eighth Amendments, for which Plaintiff seeks injunctive relief as well as nominal, special, compensatory, and punitive damages.

After the parties cross-moved for summary judgment on the TAC, the Court heard oral argument on the parties' motions on September 11, 2015.

## STANDARD OF REVIEW

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' for these purposes if it 'might affect the outcome of the suit

---

[4] Plaintiff's medical records do show, however, that Plaintiff received dental treatments at least six times while he was housed in 9 North.  Stephens Dec. Ex. 7.  It is not clear from the record whether Plaintiff was required to leave the 9 North housing area to receive those treatments.

under the governing law.'" *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 39 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). "A dispute of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* at 39–40 (quoting *Anderson*, 477 U.S. at 248).

"Where, as here, there are cross-motions for summary judgment, 'each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration.'" *Lumbermens Mut. Cas. Co. v. RGIS Inventory Specialists, LLC*, 628 F.3d 46, 51 (2d Cir. 2010) (quoting *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001)); *see Law Debenture Trust Co. v. Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir. 2010). "[N]either side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993). "Thus, the fact that both sides have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other." *Schwabenbauer v. Bd. of Educ. of City Sch. Dist. of City of Olean*, 667 F.2d 305, 313 (2d Cir. 1981).

## DISCUSSION

### I.     Applicability of the *Rooker-Feldman* Doctrine

Defendants argue that the Court lacks subject matter jurisdiction over all of Plaintiff's claims by virtue of the *Rooker-Feldman* doctrine, pursuant to which "federal district courts lack jurisdiction over suits that are, in substance, appeals from state-court judgments." *Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 84 (2d Cir. 2005). The *Rooker-Feldman* doctrine applies when four conditions are met:

> First, the federal-court plaintiff must have lost in state court.
> Second, the plaintiff must complain of injuries caused by a state-

12

> court judgment. Third, the plaintiff must invite district court review
> and rejection of that judgment. Fourth, the state-court judgment
> must have been rendered before the district court proceedings
> commenced.

*Id.* at 85 (alterations and footnote omitted). Defendants argue that Plaintiff already had the opportunity to litigate Justice Wittner's orders in New York state court and now attempts to invalidate them retroactively. Defs.' Br. 16–18.

The Court disagrees. Plaintiff's claims relate to how DOC and the individually named Defendants executed the terms of Justice Wittner's orders, not whether the orders themselves were valid. Plaintiff does not challenge here whether his telephone and mail access should have been restricted, and this Court need not question the validity of Justice Wittner's orders to rule in Plaintiff's favor. Accordingly, the *Rooker-Feldman* doctrine does not deprive the Court of jurisdiction over Plaintiff's claims.

## II.    Plaintiff's Constitutional Claims

To state a claim under 42 U.S.C. § 1983, Plaintiff must show that Defendants acted "under color of state law" and "deprived [Plaintiff] of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010) (quoting *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994)). There is no dispute that the individual Defendants—all of whom are DOC employees—acted under color of state law.

### A.    Due Process

Plaintiff raises two distinct, though overlapping, arguments that his confinement in 9 North violated his rights under the Due Process Clause of the Fourteenth Amendment. First, Plaintiff argues that the conditions and duration of his confinement violated his substantive due process rights as a pretrial detainee. Pl.'s Br. 11–12. Second, Plaintiff argues that his procedural due process rights were violated because he did not receive a response to his appeal of his CMC status,

13

a due process hearing after being subjected to non-routine restraints, or 28-Day Reviews. *Id.* at 12–13. Although the parties conflate these two types of Fourteenth Amendment claims, each merits its own discussion.

### 1. Substantive Due Process

Because pretrial detainees have not been convicted of any crime, the Due Process Clause "forbids subjecting [them] to punitive restrictions or conditions" of confinement. *Turkmen v. Hasty*, 789 F.3d 218, 237 (2d Cir. 2015). To establish a substantive due process violation, a pretrial detainee must therefore establish "that Defendants, (1) with punitive intent, (2) personally engaged in conduct that caused the challenged conditions of confinement." *Id.* at 238. Punitive intent can be established either by "'an expressed intent to punish'" or "if the challenged conditions were 'not reasonably related to a legitimate goal—if [they were] arbitrary or purposeless.'" *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 538–39 (1979)) (alteration in original). "Absent a showing of an expressed intent to punish, the determination whether a condition is imposed for a legitimate purpose or for the purpose of punishment 'generally will turn on whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].'" *Benjamin v. Fraser*, 264 F.3d 175, 188 (2d Cir. 2001) (quoting *Wolfish*, 441 U.S. at 538) (brackets in original). In other words, "in the absence of a showing of intent to punish, a court must look to see if a particular restriction or condition, which may on its face appear to be punishment, is instead but an incident of a legitimate nonpunitive governmental objective." *Wolfish*, 441 U.S. at 539 n.20.

Applying the *Wolfish* standard, as well as that articulated by the Second Circuit in its recent decision in *Turkmen*, Defendants are entitled to summary judgment on Plaintiff's substantive due process claim because Plaintiff cannot establish punitive intent. Plaintiff does not argue that any

14

Defendant acted with an "expressed intent to punish," and no evidence in the record suggests any Defendant did so. Rather, the evidence establishes that Defendants intended only to comply with the terms of Justice Wittner's orders. In addition, the conditions Plaintiff faced in 9 North were reasonably related to that legitimate goal. The December 21, 2007 Order and its subsequent modifications permitted Plaintiff to telephone only certain, specifically named individuals. Uncontradicted evidence establishes that while DOC could block specific numbers from being called by all inmates in general population, it could not permit an inmate to dial only specific numbers. Nor could DOC ensure that an inmate in general population would be prevented from asking another inmate to make a phone call on his behalf. Accordingly, in an effort to comply with Justice Wittner's orders, DOC housed Plaintiff in a unit that allowed for all his calls to be monitored and restricted his contact with other inmates, thus preventing him from asking other inmates to make calls for him.[5] In MDC, no unit but 9 North could accomplish those objectives.[6]

That Plaintiff was subjected to additional restraints in 9 North beyond those explicitly required by the December 21, 2007 Order does not alter this conclusion. Plaintiff is correct that none of Justice Wittner's orders mandated those restrictive conditions—namely, that he be kept in his cell 23 hours per day, strip searched daily, placed in enhanced security restraints when being transferred from his housing area, and prevented from attending religious services. But as *Wolfish*

---

[5] At oral argument, Plaintiff's counsel argued that Deputy Warden O'Connell's deposition testimony supports the inference that Plaintiff could have remained in general population because "[i]n order to use the telephone, an inmate must first ask permission to use the telephone, and then the corrections officer can either grant that permission or deny it, and once the telephone calls are being made, the corrections officer on station has the ability to monitor those calls." Oral Arg. Tr. 4. Not so. Although Deputy Warden O'Connell testified that inmates are "supposed to check in" before making a call, he also said that officers monitor the phone calls of general population inmates only for duration "so . . . other inmates can have an opportunity to use the phone." O'Connell Tr. 19–20. He further testified that he knew of no way for officers to record or listen to phone calls made by general population inmates. *Id.* at 20. Deputy Warden O'Connell's testimony therefore does not support the conclusion that DOC could have housed Plaintiff in general population and ensured that Plaintiff would not contact the victim or enlist another inmate to do so.

[6] Because DOC could not house Plaintiff in MDC's general population and comply with the portion of the December 21, 2007 Order relating to Plaintiff's phone privileges, the Court need not determine whether DOC could have monitored Plaintiff's mail while he was in general population.

made clear, conditions that are "incident[s] of a legitimate nonpunitive governmental objective" do not violate the Due Process Clause, even if they "may on [their] face[s] appear to be punishment." 441 U.S. at 539 n.20. Here, the record establishes that Plaintiff was removed from the general population and placed in 9 North so that DOC could comply with the December 21, 2007 Order, and the conditions of Plaintiff's confinement in 9 North were no different than the conditions experienced by any other inmate housed there. There is no evidence to suggest that any of Plaintiff's conditions of confinement were intended to punish him—or were imposed for any purpose other than DOC's legitimate goal of complying with Justice Wittner's orders. *See Turkmen*, 789 F.3d at 238 (quoting *Wolfish*, 441 U.S. at 538–39).

Plaintiff's claim closely resembles that at issue in *Brown v. Doe*, No. 13-CV-8409, 2014 WL 5461815 (S.D.N.Y. Oct. 28, 2014), *appeal dismissed*, No. 14-4252 (2d Cir. Feb. 17, 2015), which similarly held that a pretrial detainee could not state a claim that his conditions of confinement violated substantive due process when they were imposed to enforce a court order. In *Brown*, the plaintiff was also a pretrial detainee in New York who was placed in segregated housing after Justice Wittner ordered DOC to prevent him from contacting anyone by telephone except his attorney. *See* 2014 WL 5461815, at *3. Judge Ramos held that in assigning the plaintiff to segregated housing, DOC "was motivated by a legitimate nonpunitive objective: enforcing a valid court order." *Id.* at *5. So too was DOC in this case.

Plaintiff argues that *Brown* is distinguishable because the language in Justice Wittner's order in that case was different than the language in the December 21, 2007 Order. Pl.'s Opp. 17. In *Brown*, Justice Wittner authorized DOC to employ "any means necessary, including 24 hour lockdown," to ensure that the plaintiff did not contact anyone by telephone except his attorney. *Id.* at *3 (quoting Justice Wittner's order). The December 21, 2007 Order, by contrast, authorized

DOC to "move [Plaintiff] to a different facility, if necessary." Stephens Decl. Ex. 2. The Court does not find the distinction to be significant. Both orders contemplated the necessity of transferring pretrial detainees to alternate housing areas, and both required DOC to house pretrial detainees in areas that allowed DOC to restrict telephone access so that pretrial detainees could call only certain individuals. Moreover, unlike the December 21, 2007 Order, the order at issue in *Brown* did not require that the plaintiff be prevented from enlisting others to make phone calls on his behalf. *See Brown*, 2014 WL 5461815, at *3. Because the December 21, 2007 Order imposed this additional restriction, DOC arguably had even greater reason to place Plaintiff in segregated housing here than it did in *Brown*.

Plaintiff also argues that the standard articulated in *Wolfish* and the cases interpreting *Wolfish* should not apply. Citing to *Rhem v. Malcolm*, 371 F. Supp. 594 (S.D.N.Y. 1974), Plaintiff contends that Defendants are required to house pretrial detainees under conditions that "add up to the least restrictive means of achieving the purpose requiring and justifying the deprivation of liberty." Pl.'s Br. 11; Pl.'s Opp. 4–5 (quoting *Rhem*, 371 F. Supp. at 624). In *Rhem*, Judge Lasker held that the conditions of confinement at the Manhattan House of Detention for Men ("MHD") were unconstitutional because *all* pretrial detainees were housed in maximum-security conditions indiscriminately, without regard to whether such conditions were necessary. *See* 371 F. Supp. at 624. Judge Lasker found that "MHD [was] capable of classifying inmates to determine those who do and do not require maximum security custody," and that the rights of those who did not had therefore been violated. *Id.* Accordingly, the Court agrees with Defendants that *Rhem* did not purport to establish a standard to determine whether a pretrial detainee faces unconstitutional conditions of confinement when a penal institution engages in individualized assessments regarding the level of restraint necessary for each detainee. *See* Defs.' Opp. 3–4. As there is no

dispute that Plaintiff received an individualized assessment when he was assigned CMC status, *Rhem* is inapposite.

That Defendants complied with the December 21, 2007 Order by housing Plaintiff in an area that was significantly more restrictive than general population does not make the conditions of his confinement unconstitutional. The undisputed evidence establishes that DOC could not comply with Justice Wittner's orders and keep Plaintiff in MDC's general population. Nor was DOC required to use the least restrictive means possible when drafting and implementing regulations designed to ensure the efficient administration of the facility. *See A'Gard v. Perez*, 919 F. Supp. 2d 394, 401 (S.D.N.Y. 2013) ("Prison administrators are not required to use the least restrictive means possible to further legitimate penological interests."). Although it is understandable that Plaintiff viewed the conditions of his confinement in 9 North as excessive, courts "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003); *see also Santiago v. Clarke*, No. 11-CV-1024, 2013 WL 501423, at *6–7 (E.D. Wis. Feb. 11, 2013) (holding that assigning a pretrial detainee to segregated housing to comply with a court order restricting the detainee's telephone and mail access did not violate substantive due process in light of need to defer to prison officials' determination that they could not monitor the plaintiff from general population). In light of this deference, the Court concludes that housing Plaintiff in 9 North was reasonably related to the legitimate goal of enforcing Justice Wittner's orders. As Plaintiff has not established that Defendants acted with punitive intent, Defendants are

entitled to summary judgment as a matter of law with regard to Plaintiff's substantive due process claim related to the conditions of his confinement.[7]

Defendants are also entitled to summary judgment with regard to Plaintiff's claim that his substantive due process rights were separately violated because he was removed from 9 North and returned to the general population three days after Justice Wittner lifted the telephone and mail restrictions. Pl.'s Br. 13. Nothing in the record suggests the three-day gap was the product of anything other than inactionable administrative delay. Defendants' uncontradicted evidence establishes that DOC returned Plaintiff to the general population "[a]fter receiving the Order" lifting the restrictions on Plaintiff. Bowden Decl. ¶ 41. Plaintiff points to no evidence suggesting that this pace was abnormally slow and cites no legal authority in support of this claim. On this record, no reasonable juror could conclude that the three-day delay in moving Plaintiff from 9 North amounted to punishment.

## 2. Procedural Due Process

In a procedural due process claim, "a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001). When an inmate claims a liberty interest based on state law—as Plaintiff does here—such an interest "arises when state statutes or regulations require, in 'language of an unmistakably mandatory character,' that a prisoner not suffer a particular deprivation absent specified predicates." *Welch v. Bartlett*, 196 F.3d 389, 392 (2d Cir. 1999) (quoting *Hewitt v. Helms*, 459 U.S. 460, 471–72 (1983)).[8] In the context of

---

[7] Because the Court concludes that Defendants did not act with punitive intent as a matter of law, it is not necessary to determine whether each Defendant "personally engaged in conduct that caused the challenged conditions of confinement." *Turkmen*, 789 F.3d at 238.

[8] Convicted prisoners must also show that the liberty deprivation "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). In this Circuit, however, the "atypical and significant hardship" requirement does not apply to pretrial detainees. *See Johnson v. Maha*, 460 F. App'x 11, 14 (2d Cir. 2012) ("The District Court erred in applying *Sandin* . . . [to] a pretrial detainee.");

19

assigning prisoners to segregated housing, statutes or regulations can be unmistakably mandatory when they employ language "*requiring* that certain prerequisites be met and certain procedures be followed whenever a prisoner [is] subject[ed] to segregated housing." *Tellier v. Fields*, 280 F.3d 69, 81 (2d Cir. 2000). While the mere presence of "words such as 'shall,' 'unless,' and 'only' . . . is neither dispositive nor talismanic," such words can signal to a court that a regulation is mandatory. *Id.* When a regulation leaves prison officials with some discretion in determining how to act, however, it does not create a protected liberty interest. *See Pugilese v. Nelson*, 617 F.2d 916, 923–24 (2d Cir. 1980) (holding that policy statements describing federal CMC status did not create a protected liberty interest in being classified as non-CMC).

If a plaintiff possesses a protected liberty interest, a court must then determine what process is due to protect that interest. For pretrial detainees objecting to the conditions of their confinement, that inquiry turns on whether the conditions were imposed for administrative or punitive reasons. *See Best v. N.Y.C. Dep't of Corr.*, 14 F. Supp. 3d 341, 347–48 (S.D.N.Y. 2014). If the conditions were imposed for administrative reasons, "the minimal procedures outlined in *Hewitt* [*v. Helms*] are all that is required." *Benjamin*, 264 F.3d at 190; *see Best*, 14 F. Supp. 3d at 348; *see also Allah v. Milling*, 982 F. Supp. 2d 172, 183 (D. Conn. 2013). Under *Hewitt*, an inmate must "receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation."

---

*Iqbal v. Hasty*, 490 F.3d 143, 163 (2d Cir. 2007) ("*Sandin* does not apply to pretrial detainees[.]"), *rev'd on other grounds sub nom. Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Benjamin*, 264 F.3d at 188–89 (same). Nonetheless, in applying *Sandin* to claims of convicted prisoners, the Second Circuit has recognized that a "period of confinement under typical [segregated housing] conditions lasting longer than 305 days . . . triggers a protected liberty interest." *Gonzalez v. Hasty*, ___ F.3d ___, 2015 WL 5155150, at *8 (2d Cir. Sept. 3, 2015); *see Colon v. Howard*, 215 F.3d 227, 231–32 (2d Cir. 2000) (holding that an inmate's 305-day confinement in special housing unit with conditions similar to those Plaintiff experienced in 9 North satisfied *Sandin*). If a period of segregated confinement exceeding 305 days creates a liberty interest for convicted prisoners, presumably pretrial detainees, who have not been convicted, also possess such an interest. The Court need not analyze this issue, however, because Plaintiff does not argue that the duration of his confinement in 9 North triggered a separate liberty interest protected by the Due Process Clause.

*Hewitt*, 459 U.S. at 476.  The process must occur within a reasonable time after the inmate is deprived of his liberty.  *See Taylor v. Santana*, No. 05-CV-1860, 2007 WL 737485, at *4 (S.D.N.Y. 2007), *aff'd sub nom. Taylor v. Comm'r of N.Y.C. Dept. of Corrs.*, 317 F. App'x 80 (2d Cir. 2009).

If the conditions were imposed for punitive or disciplinary reasons, however, "the procedures required by *Wolff* [*v. McDonnell*, 418 U.S. 539 (1974)] apply." *Benjamin*, 264 F.3d at 190; *see Best*, 14 F. Supp. 3d at 347–48.  These include "written notice, adequate time to prepare a defense, a written statement of the reasons for action taken, and a limited ability to present witnesses and evidence." *Benjamin*, 264 F.3d at 190 (citing *Wolff*, 418 U.S. at 561–70; *see Taylor*, 2007 WL 737485, at *4.

Here, Plaintiff argues that Defendants violated his procedural due process rights in multiple ways: by assigning him CMC status, by failing to respond to his appeal, by failing to provide him a due process hearing, and by failing to conduct 28-Day Reviews.  Pl.'s Br. 12–13; Pl.'s Opp. 3–10.  Each claim is discussed in turn.

### a.    CMC Status Assignment

Plaintiff asserts he possessed a protected liberty interest in avoiding CMC status because Directive 4505R "lay[s] out specific criteria for [its] implementation." Pl.'s Br. 13; *see also* Pl.'s Opp. 5 ("Directive []4505R requires that certain criteria be met before an inmate, or pretrial detainee, can be designated CMC.").  Defendants primarily contend that Directive 4505R is sufficiently discretionary such that no liberty interest attaches to CMC classification.  Defs.' Br. 4–6; Defs.' Opp. 6–7.

This Court agrees with the numerous other decisions from this district holding that New York state inmates do not possess a protected liberty interest in avoiding CMC status.  *See Maldonado v. Kinlock*, No. 09-CV-8435 (LAP), 2012 WL 3597049, at *5–6 (S.D.N.Y. Aug. 21,

2012) (surveying case law related to CMC status and noting that courts have "uniformly concluded [that CMC regulations] do not comprise a state-created liberty interest enforceable under the Fourteenth Amendment"); *Walker v. Shaw*, No. 08-CV-10043 (CM), 2010 WL 2541711, at *5–6 (S.D.N.Y. June 23, 2010) (reviewing Directive 4505R and holding that plaintiff who was misclassified as CMC nonetheless did not possess a protectable liberty interest); *Palacio v. Ocasio*, No. 02-CV-6726 (PAC), 2006 WL 2372250, at *8 (S.D.N.Y. Aug. 11, 2006) (analogizing New York State CMC designation to federal CMC status to hold that New York State CMC regulations do not create a protectable liberty interest), *aff'd sub nom. Palacio v. Pagan*, 345 F. App'x 668 (2d Cir. 2009); *Adams v. Galletta*, No. 96-CV-3750 (JGK), 1999 WL 959368, at *5–6 (S.D.N.Y. Oct. 19, 1999) ("The laws and regulations applicable to the classification of prisoners in the custody of [DOC] provide substantial discretion to [ ] DOC and do not create a liberty interest."); *Korkala v. N.Y.C. Dep't of Corr.*, No. 84-CV-5740 (RLC), 1986 WL 9798, at *5 (S.D.N.Y. Sept. 4, 1986) (holding that predecessor to Directive 4505R "grants prison officials unlimited discretion to select inmates for evaluation or reclassification and to determine whether for such purposes they may be assigned to restrictive housing units or remain in the general prison population"); *cf. Pugilese*, 617 F.2d at 923–24 (policy statements describing federal CMC status did not create a protected liberty interest in CMC classification).[9]

---

[9] Plaintiff argues that "none of these cases are relevant because they fail to address this court's [*sic*] holding that a pretrial detainee's placement in 'segregation or other heightened restraints' triggers the right to a due process hearing." Pl.'s Opp. 11 (quoting *Best*, 14 F. Supp. 3d at 347). Plaintiff misreads *Best*, which stated in dicta that under Second Circuit law, "procedural due process requires that pretrial detainees can only be subjected to segregation or other heightened restraints if a predeprivation hearing is held to determine whether any rule has been violated." 14 F. Supp. 3d at 347 (quoting *Johnson v. Maha*, 606 F.3d 39, 41 (2d Cir. 2010)). The words "to determine whether any rule has been violated" make clear that a hearing is required only when the potential restraints are disciplinary in nature. *See Benjamin*, 264 F.3d at 190 ("[T]he procedures required by *Wolff* apply if the restraint on liberty is imposed for disciplinary reasons; if the restraint is for 'administrative' purposes, the minimal procedures outlined in *Hewitt* are all that is required."). As noted above, CMC status is administrative, and *Hewitt* does not require a predeprivation hearing.

While Directive 4505R requires that one of ten conditions be met before an inmate is given CMC status, many of the conditions themselves are extremely broad, including "[a]ny other identified factors or circumstances which would tend to indicate a requirement for central monitoring." Directive 4505R § IV(A)(3)(j). The court in *Korkala* characterized such language as affording prison officials "unlimited discretion," and this Court agrees. 1986 WL 9798, at *5. In addition, while Directive 4505R requires prison officials to "review . . . records and information" including "[c]ourt documents" before making CMC status determinations, it does not mandate how that information should be reviewed or weighed. Directive 4505R § IV(A)(2). In sum, Directive 4505R is not unmistakably mandatory.

Because Directive 4505R does not create a protected liberty interest in avoiding CMC status, Plaintiff's due process claim based on his CMC classification must fail and Defendants are entitled to summary judgment as a matter of law.

### b. Right To Appeal and To Receive a Due Process Hearing

Plaintiff also contends that his procedural due process rights were violated because Defendants did not respond to his appeal of his CMC status and because he did not receive a due process hearing as a result of being placed in administrative segregation and being subjected to enhanced security restraints. Pl.'s Opp. 10; Pl.'s Rep. 6. Defendants contend that Plaintiff's CMC status implicated no liberty interests. Defs.' Br. 3–6; Defs.' Rep. 2–5.

Unlike the provisions of Directive 4505R that afford prison officials discretion when deciding whether to assign an inmate CMC status, the provisions regarding appeals and due process hearings are mandatory. The portion of Directive 4505R related to appeals provides that an inmate may appeal his CMC designation "at any time" and that "[u]pon receipt of such appeal, the Deputy Chief of Security Operations or Chief of Department *shall* respond to the appealing

23

inmate with a written determination within fifteen (15) business days." Directive 4505R § IV(E) (emphasis added). Similarly, the portion of Directive 4505R related to due process hearings when segregated housing or enhanced restraints are imposed states that an "inmate should have, in addition to the process required by this Directive, a due process hearing as *required* by" another DOC directive. *Id.* § II(B) (emphasis added). Just as the mandatory language in the regulations at issue in *Tellier* supported a conclusion that those regulations created a protected liberty interest, so too does the language in Directive 4505R provide CMC inmates with protected liberty interests in being able to appeal their classification and to have it reviewed when additional restrictions are imposed. *See Tellier*, 280 F.3d at 81.

Indeed, *Tellier* itself distinguished between the discretion that federal regulations afforded prison officials in assigning inmates to segregated housing and the mandatory procedural safeguards designed to ensure that inmates were not kept in segregated housing unnecessarily. Reading the regulation at issue to "clearly provide[] for certain hearings and reviews that constrain the Warden's discretion in *maintaining* a prisoner in" segregated housing, the Second Circuit held that inmates had a protected liberty interest in receiving such hearings and reviews. *Id.* at 82 (emphasis in original). Directive 4505R similarly constrains DOC's discretion in maintaining an inmate's CMC status by allowing inmates to appeal that status at any time and by requiring a hearing to review any additional restraints imposed.

The Court therefore disagrees with the district court cases holding that because inmates have no liberty interest in avoiding CMC classification, they also have no liberty interest in the CMC review and appeal process, even when that process is made mandatory by DOC's own policies. *See, e.g.*, *Palacio*, 2006 WL 2372250, at \*9; *Adams*, 1999 WL 959368, at \*6 n.2; *Korkala*, 1986 WL 9798, at \*4. None of those decisions—two of which were decided before

24

*Tellier*—address *Tellier*'s reasoning that regulations can afford prison officials discretion in assigning inmates a certain status while also imposing mandatory procedural checks in order to maintain that status. *See Tellier*, 280 F.3d at 82 (agreeing that "the Warden's initial decision to place a prisoner in [segregated housing] is . . . entirely discretionary," but nonetheless concluding that "the discretion surrounding this decision is not boundless and continuing").

The parties here dispute the facts regarding whether Plaintiff was deprived of his interests in appealing his CMC status and receiving a hearing as a result of being housed in administrative segregation and subjected to enhanced security restraints. Plaintiff asserts he appealed his classification and that he did not receive a due process hearing. Pl.'s 56.1 ¶¶ 55, 67, Hunter Tr. 41–42. Defendants claim, however, that "there is no evidence" such an appeal occurred and, moreover, that DOC's practice was to conduct due process hearings when required. Defs.' Resp. 56.1 ¶ 67; Bowden Tr. 105–06.

This disagreement creates a genuine dispute as to these material issues, which precludes all parties from receiving summary judgment on the record before the Court. *See Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 161 (2d Cir. 2012) (summary judgment not appropriate when evidence of a party's "matter of practice" could lead a jury to conclude the party followed the practice in a specific instance); *see generally* Fed. R. Evid. 406 (allowing "[e]vidence of . . . an organization's routine practice [to] be admitted to prove that on a particular occasion the . . . organization acted in accordance with the . . . routine practice").

### c.     28-Day Reviews

Plaintiff further contends that Directive 4505R gave him a protected liberty interest in receiving regular reviews of his CMC status every 28 days. Pl.'s Br. 13; Pl.'s Opp. 10–12; Pl.'s Rep. 2–8. Defendants argue that Plaintiff had no protected liberty interest in such reviews and

that, even if he did, that interest was satisfied because Plaintiff had the opportunity to contest Justice Wittner's orders in New York state court. Defs.' Br. 3–7; Defs.' Opp. 4–7; Defs.' Rep. 4–5.

Just as prison officials are required to permit inmates to appeal their CMC status and to provide due process hearings when additional restraints are imposed, they are similarly required to conduct 28-Day Reviews. Indeed, Directive 4505R provides that such reviews "*shall* be recorded on 'review of C.M.C. Designation form'" and "*shall* also be maintained in the inmates' facility folder and in a central Operations Division file." Directive 4505R § IV(F) (emphasis added). Under *Tellier*, this language is unmistakably mandatory.[10]

Because CMC designations are administrative and not punitive, Plaintiff was entitled, after every 28-Day Review, to "receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to [keep him in] administrative segregation." *Hewitt*, 459 U.S. at 874. Defendants' argument that Plaintiff had the opportunity to challenge Justice Wittner's orders in state court is therefore misplaced; regardless of whether Plaintiff had such an opportunity, he was entitled to the protections described in *Hewitt* with regard to every 28-Day Review.

The parties dispute whether Plaintiff received regular 28-Day Reviews. At his deposition, Plaintiff testified regarding his lack of opportunity to appeal his classification through the 28-Day Review process:

---

[10] None of the prior district court cases analyzing CMC status for New York state inmates directly address whether prisoners possess a liberty interest in receiving 28-Day Reviews. In both *Adams* and *Korkala*—both pre-*Tellier* cases—the courts explicitly noted that the plaintiffs in question received monthly reviews of their statuses. *See Adams*, 1999 WL 959368, at *2 ("The plaintiff's CMC designation was reviewed every 28 days, pursuant to established DOC procedure[.]"); *Korkala*, 1986 WL 9798, at *5 ("Plaintiff was accorded monthly due process review hearings."). *Maldonado*, *Walker*, and *Palacio* do not address 28-Day Reviews.

> Q: The two addresses is New York City Department of Correction Intelligence Unit or the New York City Department of Correction Commissioner of Correction?
> A: Yeah, that's who I was told to write to.
> Q: Is it your testimony that you wrote to both of these places?
> A: Yes.
> Q: Specifically regarding the fact that your solitary confinement was not reviewed?
> A: And to appeal and who would do my 28 days. Why am I not given the 28 days opportunity to appeal.
> Q: Just to be clear, was the point of your communication to these two offices to say you didn't belong in solidary or you that you wanted the opportunity for the 28-day review?
> A: Both. I wanted to know why and why am I not given a chance to appeal. Whose ever determination it was. Because, to this day, I still don't know who said put me in solitary confinement and that's been a [sic] ongoing issue.

Hunter Tr. 41–42. To establish that Plaintiff did receive 28-Day Reviews, Defendants cite to a declaration submitted by Captain Bowden in which he admits having no personal involvement in any reviews of Plaintiff's classification, but asserts that "those reviews were conducted as a part of DOC's practice in every case." Bowden Decl. ¶ 35.[11]

Because both parties rely only on their own assertions, and neither party has submitted any documentary evidence on this issue, there is a genuine dispute as to this material issue and no party is entitled to summary judgment.

### B.    Deliberate Indifference

Plaintiff also claims that Defendants were deliberately indifferent to his conditions of confinement in violation of the Eighth Amendment. Pl.'s Br. 14–16. Defendants argue that the Eighth Amendment does not apply to pretrial detainees and that Plaintiff's deliberate indifference claim fails in any event. Defs.' Br. 9–13.

---

[11] Defendants concede, however, that "some records of the [28-Day Reviews] could not be located." Defs.' Resp. 56.1 ¶ 58.

As a preliminary matter, Defendants are correct that Plaintiff's claim arises not under the Eighth Amendment, but under the Fourteenth Amendment. The Eighth Amendment, which prohibits cruel and unusual punishment, does not apply to pretrial detainees, who "cannot be punished at all." *Johnson v. Maha*, 606 F.3d 39, 41 (2d Cir. 2010). Accordingly, "a person detained prior to conviction receives protection against mistreatment at the hands of prison officials under the Due Process Clause." *Caiozzo v. Koreman*, 581 F.3d 63, 69 (2d Cir. 2009); *see Best*, 14 F. Supp. 3d at 355. The distinction has no practical effect on the analysis, however, as "claims for deliberate indifference . . . should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment." *Caiozzo*, 581 F.3d at 72. A pretrial detainee's due process claim for deliberate indifference based on his conditions of confinement therefore requires him to establish that "(1) objectively, the deprivation [he] suffered was sufficiently serious that he was denied the minimal civilized measure of life's necessities, and (2) subjectively, the defendant official acted with a sufficiently culpable state of mind, such as deliberate indifference to inmate health or safety." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013).

To satisfy the objective prong, Plaintiff "must show that the conditions, either alone or in combination, pose[d] an unreasonable risk of serious damage to his health." *Id.* Inmates are entitled to "basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety." *Helling v. McKinney,* 509 U.S. 25, 32 (1993) (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.,* 489 U.S. 189, 199–200 (1989)). "[T]here is no static test to determine whether a deprivation is sufficiently serious; the conditions themselves must be evaluated in light of contemporary standards of decency." *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012). Claims "predicated on [segregated housing] confinement therefore typically accrue[] only after an inmate

28

has been confined in the [segregated housing unit] for a prolonged period of time." *Gonzalez v. Hasty*, ___ F.3d ____, 2015 WL 5155150, at *9 (2d Cir. Sept. 3, 2015) (remanding to district court to determine in the first instance when plaintiff's claim based on 877-day confinement in segregated housing accrued); *cf. Shannon v. Selsky*, No. 04-CV-1939, 2005 WL 578943, at *6 (S.D.N.Y. Mar. 10, 2005) (holding that normal conditions of segregated housing confinement, without more, typically do not satisfy the objective prong).

To satisfy the subjective prong, Plaintiff must show that Defendants "kn[e]w of, and disregard[ed], an excessive risk to inmate health or safety." *Jabbar*, 683 F.3d at 57. Deliberate indifference "requires 'more than mere negligence.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)). To be liable, a prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

Here, even assuming *arguendo* that Plaintiff's 353-day confinement in 9 North satisfies the objective prong, *see Gonzalez*, 2015 WL 5155150, at *9, Plaintiff fails to satisfy the subjective prong. Plaintiff argues that Defendants "acted with deliberated indifference because they knew of, and expressly authorized, [Plaintiff's] conditions of confinement, in full knowledge of the plain terms of" Justice Wittner's orders. Pl.'s Opp. 15. According to Plaintiff, this combination "manifested a deliberate indifference for [his] health, safety, and well being." *Id.* No evidence, however, suggests that Defendants were aware of any conditions in 9 North that posed a substantial risk of serious harm to Plaintiff. For example, while Plaintiff claims he declined medical care for his wrist injury because of the enhanced security restraints used when taking him to be treated, he does not point to any facts suggesting that the individual Defendants knew about his wrist injury or that the enhanced restraints exacerbated it.

In short, there is no evidence in the record supporting an allegation that any Defendant knew of an excessive risk to Plaintiff's health or safety and disregarded it. Defendants are therefore entitled to summary judgment with regard to Plaintiff's deliberate indifference claim.

## III.   Municipal Liability

Municipalities are not liable under § 1983 "unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. Dep't of Soc. Svcs. of City of N.Y.*, 436 U.S. 658, 691 (1978). Plaintiff's procedural due process claims are premised on his assertion that the individual Defendants failed to comply with Directive 4505R, not that Directive 4505R itself constitutes a policy that deprives him of due process. Plaintiff does not allege that the City has an unwritten policy or practice designed to deprive CMC inmates of appeals, due process hearings, or 28-Day Reviews. Accordingly, Plaintiff's procedural due process claims against the City fail as a matter of law.

## IV.   Individual Liability and Immunity

Each of the four individually named Defendants had some measure of official responsibility regarding how Plaintiff's CMC designation should be reviewed. As the Chief of Special Operations at OSIU, Walsh had "primary responsibility for receiving and conducting inmate appeals of CMC status and supervising [28-Day Reviews]." Pl.'s 56.1 ¶ 66; Directive 4505R § IV(E). Captain Bowden and Captain Concepcion conducted CMC inmates' 28-Day Reviews. *See* Defs.' Resp. 56.1 ¶ 59; Concepcion Tr. 50–51. Finally, as Deputy Warden of Security at MDC, O'Connell was responsible for receiving and transmitting 28-Day Reviews to inmates. *See* Defs.' Resp. 56.1 ¶ 64; Directive 4505R § IV(F). The record is thus sufficient to

establish the personal involvement or responsibility of these Defendants, and Plaintiff may proceed in his case against them.[12]

Moreover, neither absolute nor qualified immunity shields any individual Defendant from liability. Although Defendants argue that they are entitled to absolute immunity because they acted to enforce valid state court orders, Defs.' Br. 13–14, whether Plaintiff received the procedural safeguards articulated in Directive 4505R is distinct from whether it was appropriate to assign Plaintiff CMC status in the first place. Directive 4505R entitled Plaintiff to its mandatory procedural safeguards regardless of why he was designated CMC.

Defendants further argue they are entitled to qualified immunity, which "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To determine whether a right is clearly established, the Court must "consider[] '(1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.'" *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 60 (2d Cir. 2014) (quoting *Ying Jing Gan v. City of N.Y.*, 996 F.2d 522, 532 (2d Cir.1993)).

Here, all three considerations counsel against qualified immunity being available to the individual Defendants based on the record currently before the Court. The right in question—the right to receive the procedural safeguards required by Directive 4505R—is specific, especially

---

[12] Plaintiff's claims against Captain Concepcion are deemed timely because she has abandoned her opportunity to argue otherwise. *See Taylor v. City of N.Y.*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.").

since it is explicitly created and defined by official DOC policy. The decisional law of this Circuit, as reflected in *Tellier*, is clear that mandatory regulations requiring that certain procedures be followed in order to maintain a prisoner's administrative status give rise to protectable due process liberty interests. *See Tellier*, 280 F.3d at 81; *Matusick*, 757 F.3d at 60 (stating that courts must consider "the decisional law of the Supreme Court and the applicable circuit"). Given the mandatory nature of the procedural safeguards, it is not clear how Defendants could have thought they were acting lawfully by depriving them. Indeed, Captain Bowden himself acknowledged that DOC's practice is to conduct regular 28-Day Reviews "in every case." Bowden Decl. ¶ 35.

Even so, the record does not clearly indicate what any individual Defendant did, if anything at all, to deprive Plaintiff of the procedural safeguards to which Directive 4505R entitled him. It is therefore impossible to determine at this stage whether a "reasonable defendant official" would have thought that any individual Defendant's conduct was unlawful. Defendants may raise such a defense at trial. *See Hollman v. Lindsay*, No. 08-CV-1417, 2009 WL 3112076, at *15–16 (E.D.N.Y. Sept. 25, 2009) (reserving decision on qualified immunity "when the record does not indicate what actions [defendants] took or failed to take").

## V. Remedies

Plaintiff seeks injunctive relief as well as nominal, compensatory, and punitive damages. Pl.'s Br. 24. Defendants argue that Plaintiff is not entitled to an injunction, compensatory damages, or punitive damages. Defs.' Br. 18–20.

With regard to injunctive relief, the Court agrees with Defendants that Plaintiff's request for an injunction is moot. First, Plaintiff has no remaining claims against the municipal Defendants. Second, Plaintiff now resides in Green Haven Correctional Facility, not MDC. Pl.'s Resp. 56.1 ¶ 11. "It is well established in this Circuit that 'an inmate's transfer from a prison

facility generally moots claims for declaratory and injunctive relief against officials of that facility.'" *Johnson v. Killian*, No. 07-CV-6641, 2013 WL 103166, at *3 (S.D.N.Y. Jan. 9, 2013) (quoting *Shepherd v. Goord*, 662 F.3d 603, 610 (2d Cir. 2011)). Accordingly, no injunctive relief is available to Plaintiff.

With regard to compensatory and punitive damages, the record before the Court is insufficient to determine what damages may be available to Plaintiff on his remaining procedural due process claims. It is not clear from the record, for instance, whether Plaintiff suffered any physical injuries as a result of not receiving the procedural safeguards required by Directive 4505R. The question of damages is thus appropriately reserved for trial.

## CONCLUSION

Plaintiff's motion for summary judgment is denied. Defendants' motion for summary judgment is granted with respect to Plaintiff's substantive due process claim, Plaintiff's procedural due process claim as it relates to Plaintiff being assigned CMC status, and Plaintiff's deliberate indifference claim. Defendants' motion is otherwise denied. The Clerk of Court is respectfully directed to terminate the City and DOC as Defendants because no claims remain against them and to close the docket entries at ECF Nos. 124 and 130. A status conference is hereby scheduled for October 8, 2015 at 11 a.m. The parties shall confer in advance as to how they propose to proceed, including whether a reference to a magistrate judge for a settlement conference would be productive.

SO ORDERED.

Dated: September 28, 2015
New York, New York

Ronnie Abrams
United States District Judge

33